FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 JAN 21 AM 10: 15

U.S. DISTRICT COURT
N.D. OF ALABAMA

EMERY RAY ROSSER,          )
                           )
     Plaintiff,            )
                           )
vs.                        )          CV-97-BU-1171-S
                           )
NORFOLK SOUTHERN RAILWAY   )
COMPANY, et al.,           )          ENTERED
                           )
     Defendants.           )          JAN 2 1 1999

## Memorandum Opinion

This cause comes on to be heard on a motion for summary judgment filed by defendants the City of Birmingham, Captain Nunn, Johnnie Johnson, Officer W. Estis, Rita Hall, Thomas Bently, Jerry R. Kennedy and James R. Parsons, Jr., on November 10, 1998, and a motion for summary judgment filed by defendants Norfolk Southern Railway Company and Baron T. Reaves on October 19, 1998. In their motions, the defendants aver that the plaintiff cannot raise a genuine issue of material fact permitting this case to continue to trial. The plaintiff has failed to respond to said motions.

Summary judgment provides the parties an invaluable opportunity to test the mettle of a case before it ever reaches trial. On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of

31

law. FED. R. CIV. P. 56(c). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment has the initial responsibility of informing this court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. Id. at 323. The movant's burden is not meager; it must illuminate for the court the reasons why the non-movant cannot or does not raise a genuine issue of material fact sufficient to support a trial.

Once the moving party has satisfied this initial burden, however, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 523 (11th Cir. 1994). Rule 56(e) requires the nonmoving party to "go beyond the pleadings" and by "affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts'" showing there exist genuine issues for trial. *Celotex*, 477 U.S. at 324; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). "Tenuous insinuation" and empty speculation based on loose construal of the evidence will not satisfy the non-movant's burden. *Cf. Mesnick v. General Elec. Co.*, 950 F.2d 816, 820 (1st Cir. 1991), *cert. denied*, 504 U.S. 985 (1992).

While the court may consider the offered "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" in deciding whether to grant or deny a summary judgment motion, FED. R. CIV. P. 56(c), the Rule "saddles the non-movant with the duty to 'designate' the specific facts in the record" supporting its claims. *Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996). "Rule 56 . . . does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition." *Id. See also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."), *cert. denied*, — U.S. —, 116 S.Ct. 74 (1995).

In resolving whether a given factual dispute requires submission to a jury, the court must inspect the presented evidence through the looking glass of each party's substantive evidentiary burden. *Anderson*, 477 U.S. at 254-55. The court, however, must avoid weighing conflicting evidence for probity or making credibility determinations. *Welch v. Celotex Corp.*, 951 F.2d 1235,

1237 (11th Cir. 1992). "It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather decide whether such issues exist to be tried. The Court must avoid weighing conflicting evidence or making credibility determinations." *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993). At the same time, "[t]he nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law; 'there must be a substantial conflict in evidence to support a jury question.'" *Tidwell v. Carter Products*, 135 F.3d 1422, 1425 (11th Cir. 1998) *(citing Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir.1989)).

The plaintiff has failed to respond with briefs or evidence to the defendants' motions for summary judgment. The court is therefore to assume the facts, as presented by the defendants, to be true; however, this does not absolve the court of the duty to present those facts in the light most favorable to the plaintiff. Further, the court's burden in this case is a limited one — i.e., whether the defendants have satisfied their initial burden of presenting to the court the reasons why the plaintiff cannot raise a genuine issue of material fact sufficient to support a trial.

### Facts

On the night of April 24, 1997, Baron Reaves ("Reaves"), a properly commissioned railway policeman employed by Norfolk Southern Railway Company, was patrolling the 1600 block of Powell Avenue in Birmingham, Alabama, when he chanced upon the plaintiff, Emery Ray Rosser ("Rosser") occupying an old rail car designated "the Heart of Dixie Railroad Museum" that is located on Norfolk Southern property. As Reaves asked Rosser for identification, police officers Jerry R. Kennedy and James Parsons, Jr., arrived. After Rosser refused to show identification to the officers, stating that he "didn't have to show a damn thing" and "didn't have to show shit," the officers asked Rosser to accompany them to their vehicle. Rosser refused the invitation. A struggle then ensued between Rosser and the officers.

When it began to appear that Rosser, who is a large man, might overpower the officers, Reaves went to their assistance. Reaves did not initiate any physical contact with Rosser and, in fact, did not touch him until after the altercation broke out. During the struggle, Rosser attempted to remove a large can of mace or pepper spray from his pocket. In turn, Reaves warned Rosser not to

remove the can from his pocket; otherwise Reaves would spray Rosser with mace of his own. Rosser continued the attempt to pull the can from his pocket and stated that he was not going to jail. True to his warning, Reaves then sprayed mace into Rosser's face. The spray did not affect Rosser, who continued to struggle. It took several more minutes before police officers, aided by Reaves, were able to handcuff Rosser and place him in a patrol vehicle. After he was secured in the parol vehicle, the Birmingham Fire Department was called to clean the spray from Rosser and he was transported to Cooper Green Hospital for further cleaning. Rosser sustained no injuries.

After verifying by contacting Wayne Clark, the President of Heart of Dixie Railroad, Inc., that Rosser was trespassing on property of the Northern Suffolk Railway Company, Rosser was then transported to the Birmingham City Jail on the charge of criminal trespassing. Mr. Clark signed a complaint and warrant against Rosser shortly thereafter. On October 29, 1997, following trial, the plaintiff was found guilty of the charge of criminal trespassing and sentenced to 30 days in jail.

Rosser filed this lawsuit on May 12, 1997, against the Norfolk Southern Railroad Company, Joe Durham, Wayne Clark, the City of Birmingham, Capt. Nunn, Officer Estis, Rita Hall, and Tom Bentley and amended his complaint on October 16, 1997, to add Baron Reaves, Jerry R. Kennedy, and James Parsons, Jr., as defendants and to dismiss Joe Durham. The claims contained in the plaintiff's Complaint against the city defendants appear to be couched as violations of the rights contained in the Fourth and Fourteenth Amendments to the Constitution of the United States brought pursuant to 42 U.S.C. § 1983. No state law claims are contained in the complaint or amended complaint against these defendants. Rosser alleges that the Norfolk Southern Railway Company exercised illegal ownership over the property in question, that Reaves exercised illegal ownership over the property in question, that the Norfolk Southern Railway Company conspired with City of Birmingham police officers to exercise illegal ownership over the property in question, that the Norfolk Southern Railway Comapny and non-party Joe Durham conspired to violate Mr. Rosser's federal rights and that Reaves assaulted the plaintiff.

Contentions & Analysis

I. CLAIMS AGAINST THE CITY OF BIRMINGHAM, CAPT. NUNN, JOHNNIE JOHNSON, OFFICER W.
ESTIS, RITA HALL AND THOMAS BENTLEY.

Defendants City of Birmingham, Capt. Nunn, Johnnie Johnson, Officer W. Estis, Rita Hall
and Thomas Bentley have never had service of process effected as to them. On February 12, 1998,
Chief Judge Sam C. Pointer Jr., issued an order that plaintiff show cause within 21 days why the
claim against these defendants should not be dismissed for want of prosecution pursuant to Fed. R.
Civ. P. 4(m). Plaintiff failed to show cause pursuant to said order and never perfected service on
these named defendants. For this reason, all claims by the plaintiff against these defendants will be
DISMISSED, without prejudice.[1]

II. CLAIMS AGAINST JERRY R. KENNEDY AND JAMES PARSON, JR.

The defendants claim that they are entitled to qualified immunity on the plaintiff's claims of
excessive force in violation of the Fourth Amendment. In addressing an officer's claim of qualified
immunity, the court is to engage in a three part inquiry: First, the court must develop the facts in the
light most favorable to the plaintiff, both with regard to objective facts and subjective mental states,
where relevant to the offense. *Crawford-El v. Britton*, --- U.S. ---, 118 S.Ct. 1584, 1597 (1998). Next,
the court must resolve whether the conduct of the defendant officer constituted a violation of the
plaintiff's constitutional rights under presently existing constitutional law. *County of Sacramento v.
Lewis*, --- U.S. ---, --- S. Ct. ---, 1998 WL 259980, *4 n.5 (May 26, 1998); *Siegert v. Gilley*, 500 U.S.
226, 232 (1991).[2] Only after this may the court examine the issue of whether the rights in question

---

[1]  The court further notes that the plaintiff has failed to perfect service of process on defendant Wayne
Clark. As such, all claims against defendant Wayne Clark will be DISMISSED, without prejudice.

[2]  In *Lewis*, the Supreme Court clarified the rationale behind resolving the substantive issues in a
qualified immunity case before addressing the question of whether the law was clearly established at the time of the
violation:

... [T]he generally sound rule of avoiding determination of constitutional issues does not readily fit
the situation presented here; when liability is claimed on the basis of a constitutional violation, even a
finding of qualified immunity requires some determination about the state of constitutional law at
the time the officer acted. What is more significant is that *if the policy of avoidance were always
followed in favor of ruling on qualified immunity whenever there was no clearly settled constitutional rule
of primary conduct, standards of official conduct would tend to remain uncertain, to the detriment of both*

were clearly established at the time of the violation and whether a reasonable official would have been aware of a violation of that right given the then-known facts. *County of Sacramento v. Lewis*, 1998 WL 259980 at *4 n.5.

In *Screws v. United States*, 325 U.S. 91, 107 (1945), the Supreme Court held that the Fourteenth Amendment Due Process Clause invested an individual "the right to be tried by a court rather than by ordeal." The context of this assertion was a claim that local law enforcement had "arrested" a black man whom they disliked and effectuated the "arrest" through deadly, and ultimately lethal, force. *Id*. The employment of that force, the Court held, constituted punishment, employed without prior trial in court due the victim. *Id*. at 106.

From this humble origin, the various circuits began to recognize claims of excessive force, not only in those circumstances in which a victim died as a result of the inappropriately used force, *see*, *Jenkins v. Averett*, 424 F.2d 1228, 1232 (4th Cir. 1970), but also when the victim was merely injured. *See, for example, Tolbert v. Bragan*, 451 F.2d 1020, 1020 (5th Cir. 1971) (holding that federal prisoner transferred to state jail to answer state charges could state a claim of excessive force where five local jailers severely beat him with blackjacks) and *Jacobs v. City of New Orleans*, 484 F.2d 24, 25 (5th Cir. 1973) (upholding the appropriateness of a $500.00 award in an excessive force claim against police, in which the plaintiff, whose involvement in a brawl with police caused him only $137.00 in medical expenses, did not lose wages and suffered no permanent injury).

Given the apparent Fourteenth Amendment origins of the prohibition against excessive force

---

*officials and individuals*. An immunity determination, with nothing more, provides no clear standard, constitutional or non-constitutional.

*City of Sacramento v. Lewis*, 1998 WL 259980 at *4 n.5 (emphasis added). The court is, therefore, "to determine the right before determining whether it was previously established with clarity," with the purpose of establishing clear legal standards for all future cases and conduct, to the benefit of officers, where the resolution of the constitutional issue may be in their favor, and individuals, whether qualified immunity is ultimately granted or not, where the resolution of the constitutional right is in favor of the plaintiff. *Id*. at *4 n.5.

The court is also aware of *Santamorena v. Georgia Military College*, 147 F.3d 1337, 1343 (11th Cir. 1998), in which a panel of the Eleventh Circuit Court of Appeals has apparently turned the rather clear directive in *Lewis* on its head, stating, among other rationales, that "[a]lthough a majority of the Justices did join in Justice Souter's opinion (including footnote 5) for the Court, we cannot say that footnote 5 is doubtlessly a holding of the Court." *Id*. at n.14. The *Santamorena* court held that "(1) where the existence of a constitutional right (or duty) presents a perplexing question, (2) where the alleged right obviously was not already clearly established, and (3) where the qualified immunity determination does end the whole case[,] it remains appropriate, and sometimes preferable, to stop at the determination that the right, if any, was not clearly established." The only way in which this court can square the two apparently conflicting pronouncements is to treat the holding of *Santamorena* to allow the court the option to avoid a difficult constitutional question in a case in which it is obvious that no right was clearly established at the time of a defendant's actions.

in *Screws*, it is unsurprising that the excessive force claim evolved into a right insured by substantive due process at the hands of the circuit courts. *See Hamilton v. Chaffin*, 506 F.2d 904, 909 (5th Cir. 1975) (reiterating substantive due process test for determining the existence of excessive force). Under the substantive due process formulation of excessive force, determining the existence of excessive force, "a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent and injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973), *cert. denied*, 414 U.S. 1033 (1974).

In *Tennesse v. Garner*, 471 U.S. 1 (1985), the Supreme Court began to weigh in against the use of a substantive due process test to determine claims of excessive force when the force was used in effectuating an arrest. In *Garner*, the plaintiff, the father of a child who was shot by police while fleeing, brought an action contending that the shooting of his son by the police constituted excessive force. The Court addressed the claim as a Fourth Amendment issue, stating that "[b]ecause one of the factors [in resolving the reasonableness of a seizure] is the extent of the intrusion, it is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out." *Id*. at 8. However, in the wake of *Garner*, this circuit still relied on the substantive due process test in resolving excessive force claims involving the arrest or seizure of an individual. *See Popham v. City of Kennesaw*, 820 F.2d 1570, 1576 (11th Cir. 1987) (reciting substantive due process test for excessive force).

In *Graham v. Conner*, 490 U.S. 386, 393 (1989), the Court determined that the substantive due process standard was not applicable in all instances of excessive force. In the case of the seizure of a suspect, the Fourth Amendment ban on unreasonable seizures was, in light of *Tennessee v. Garner*, held to apply. *Id*. at 394-95. In assessing whether an application of force against a suspect is reasonable, the Court noted to what features of the police action a court should attend:

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of "'the nature and quality of the intrusion on the individual's Fourth Amendment interests'" against the countervailing governmental interests at stake. [*Tennessee v. Garner*, 471 U.S.] at 8 [], *quoting United States v. Place*, 462 U.S. 696, 703 [] (1983). Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. *See Terry v. Ohio*, 392 U.S., at 22-27 []. Because "[t]he test of reasonableness under the Fourth Amendment is

not capable of precise definition or mechanical application," *Bell v. Wolfish*, 441 U.S. 520, 559 [] (1979), however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *See Tennessee v. Garner*, 471 U.S., at 8-9 [] (the question is "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure").

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *See Terry v. Ohio, supra*, 392 U.S., at 20-22 []. The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested, *Hill v. California*, 401 U.S. 797 [] (1971), nor by the mistaken execution of a valid search warrant on the wrong premises, *Maryland v. Garrison*, 480 U.S. 79 [] (1987). With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," *Johnson v. Glick*, 481 F.2d, at 1033, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation.

As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *See Scott v. United States*, 436 U.S. 128, 137-139 [](1978); *see also Terry v. Ohio, supra*, 392 U.S., at 21 [] (in analyzing the reasonableness of a particular search or seizure, "it is imperative that the facts be judged against an objective standard"). An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional. *See Scott v. United States, supra*, 436 U.S., at 138, 98 S.Ct., at 1723, *citing United States v. Robinson*, 414 U.S. 218 [] (1973).

*Graham v. Conner*, 490 U.S. at 396-97. "Of course, in assessing the credibility of an officer's account of the circumstances that prompted the use of force, a factfinder may consider, along with other factors, evidence that the officer may have harbored ill-will toward the citizen." *Id*. at 399.

In the aftermath of *Graham*, the Eleventh Circuit Court of Appeals has developed a different approach to excessive force claims than that pursued originally.[3] The approach developed is fact sensitive, examining whether any of the force used was necessary to effect the arrest and, of the force that was not, whether it was reasonable in light of the factors announced in *Graham*, i.e., "the severity of the crime, whether the suspect poses an immediate threat, and whether the suspect is resisting or

---

[3]       In fact, *Graham* did not result in an overnight change in the approach in this circuit to excessive force claims. *See Moore v. Gwinett County*, 967 F.2d 1495, 1498 (11th Cir. 1992) (applying substantive due process analysis to claim of excessive force where plaintiff was subjected to alleged force during an arrest).

fleeing." *Post v. Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993). This court undertakes this analysis in the light that the reasonable officer would have viewed the circumstances with which the actual officer was presented. *See id*.

The Eleventh Circuit Court of Appeals has held that in resolving whether qualified immunity is appropriate in an excessive force case, the court is to examine whether "every reasonable officer in the [actual officer's] position [would] conclude the force was unlawful." *Post v. Fort Lauderdale*, 7 F.3d at 1559. This formulation of the qualified immunity standard is woefully unclear: It is hard to see how an analysis under qualified immunity that *every* reasonable officer would conclude the existence of unlawful force differs from a straightforward excessive force analysis that *any* reasonable officer would conclude the existence of unlawful force. *See Thornton v. City of Macon*, 132 F.3d at 1400 (employing ostensibly a straightforward excessive force standard in the qualified immunity analysis). This court imagines that all hypothetical reasonable officers share equal rationality and, therefore, one is as good as a thousand.

The actual employment of the "every reasonable officer" standard belies its apparent weakness, in any case. In practice, this court is to investigate whether a reasonable officer could find that the suspect's actions implied a certain severity of offense, an immediate threat and the possibility of resistance or flight. *See Id*; *Post v. Lauderdale*, 7 F.3d at 1559; *Ortega v. Schramm*, 922 F.2d 684, 695 (11th Cir. 1991). In cases in which the law of the state has clarified whether behavior attributable to the suspect implicates an offense of a given severity or federal law has determined whether a suspect's behavior permits the force, the determination of whether a reasonable officer could find the suspect's action reasonably implied the use of force can be accomplished by reference to that law.

Three recent cases by the Eleventh Circuit Court of Appeals have impliedly, if not explicitly, utilized a de minimis force rule in denying excessive force claims. In *Post v. Fort Lauderdale*, 7 F.3d 1552, during an arrest of the plaintiff for an ostensible violation of the City's building code, an officer placed the plaintiff into a choke hold, handcuffed him and pushed him against a wall. The court found, citing *Leslie v. Ingram*, 786 F.2d 1533, 1536 (11th Cir. 1986), as its basis for clearly established law *at the time of the alleged constitutional violation*, that the force used by the officer was not unreasonable because the amount of force used was minimal.[4] In *Gold v. City of Miami*, 121 F.3d at

---

[4]     *Leslie* was a pre-Graham case under which the de minimis standard was employed.

1446, the police left handcuffs on the plaintiff too tightly for an extended period of time. Uncritically citing *Post*, the court determined that qualified immunity barred the claim of excessive force, because "the minor nature of this injury reflect[ed] that minimal force was used to apply the handcuffs." *Id*. Finally, in *Jones v. City of Dothan*, 121 F.3d 1456, 1460 (11th Cir. 1997), the police "'slammed' [the plaintiff] against [a] wall, kicked his legs apart, required him to raise his hands above his head, and pulled his wallet from his pants." The court found, again citing *Post*, that the force and injury used were minor in nature, permitting a finding that qualified immunity barred the damages claim. *Id*.

The de minimis rule, as expressed in these cases, appears to be nothing but a holdover from the Eleventh Circuit's pre-*Graham* caselaw. *Post* conflated the analysis of excessive force under substantive due process with the Fourth Amendment claim and two subsequent cases in this circuit have followed suit. Nonetheless, the de minimis standard would be the uncontravertable law of the circuit, *see United States v. Hogan*, 986 F.2d 1364, 1369 (11th Cir. 1993), were it not that prior to *Post* and after *Graham*, the Eleventh Circuit Court of Appeals had already set forth a standard to be followed in post-*Graham* excessive force cases that did not employ the de minimis rule. In *Ortega v. Schramm*, 922 F.2d at 695-96, a sheriff and his deputy entered into a gas station where the plaintiffs were, blowing off the door lock with a shotgun. While they searched the station, the plaintiffs were held at bay at gunpoint. Afterwards, they were taken out to the station parking lot at gunpoint, while one plaintiff, Ortega was dragged outside. Two other plaintiffs requested medical assistance for Ortega. The police placed all three in handcuffs. The court determined, *without reference to whether the force was minimal or not* (and, in light of the subsequent cases, it was clearly minimal), that the force used against *all of the plaintiffs* was unreasonable, with reference *only* to the factors set forth in *Graham*. *See id*.

The best justification of de minimis standard is as a bright line a rule of thumb generally employed in resolving excessive force claims on the basis of qualified immunity where the circumstances and the pre-established law are such that the *Graham* test for excessive force would yield no definite answer. In such circumstances, officers should not be subjected to liability for using "some degree of physical coercion or threat thereof" to make a seizure. However, where an officer's use of force would inflict severe injury, the court should undertake a thorough analysis of the

*Graham* factors to determine if a reasonable officer would find the injurious force excessive.[5] Essentially, in cases in which a reasonable officer could not be certain of the degree of force permitted him under then-current law, liability could not be imposed unless the force employed in the case was more than minimal. *See Sheth v. Webster*, 145 F.3d 1231, 1238 (11th Cir. 1998) (choosing not to employ de minimis limitation in a case in which plaintiff was unharmed, but in which the police action similar to that at issue had previously been deemed a violation of a clearly established right).

In the instant case, the court need not go so far as to determine if the defendant officers are entitled to qualified immunity. Under a straightforward application of *Graham*, there has been no Fourth Amendment violation. It is clear from the briefs that the defendant officers utilized force in removing the plaintiff from the railroad car; the court will assume that some of the force utilized was unnecessary. However, analyzing the use of force in light of "the severity of the crime, whether the suspect poses an immediate threat, and whether the suspect is resisting or fleeing," the court finds that the force used was not excessive. Although the crime of which the plaintiff was eventually charged was not severe, the plaintiff, in the course of the altercation threatened to use mace or pepper spray on the officers and attempted to resist a legitimate arrest.

There are no allegations that the defendant officers caused *any* specific harm to the plaintiff in escorting him to the patrol car. The only specific allegation of harm is that Reaves, who is not a police officer, sprayed the plaintiff in the face with mace. Therefore, even if the mere tussle could be considered excessive under present law, qualified immunity would protect the plaintiff. Here, because there have been no prior cases involving the use of mace against a resisting suspect, the court would apply the de minimis standard. As no injury has been done to the plaintiff, the officers are entitled to qualified immunity.[6]

---

[5] The Supreme Court has already held that use of deadly force is impermissible in apprehension of a suspect except where "the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction of serious physical harm." *Tennesse v. Garner*, 471 U.S. at 11-12. Also, in erupting circumstances in which force likely to cause injury erupts might be required and the need for severe force is not so readily apparent, requiring officers to analyze the reasonableness of their decisions under the law may provide them with a cooling-down time in order that they may react professionally and not passionately.

[6] The court notes the existence of a possible false arrest claim by the plaintiff. Where the plaintiff is arrested without a warrant, to make out a false arrest claim under the Fourth Amendment, the plaintiff must demonstrate that the officer had probable cause for the arrest. In *Williamson v. Mills*, 65 F.3d 155, 158 (11th Cir. 1995), this court stated:

The Fourth Amendment permits warrantless arrests if made with probable cause. *E.g., United States*

III. CLAIMS AGAINST REAVES.

Rosser apparently alleges that Reaves assaulted him by spraying him with pepper spray. Reaves responds that he is entitled to discretionary function immunity under Alabama law and, even if not, because he was acting in self-defense, the plaintiff is unable to state a claim. A properly commissioned railway policeman, acting within the line and scope of his duty, is a peace officer of the State of Alabama, afforded protection by Alabama statutes pertaining to peace officers. *See Hill v. State*, 339 So. 2d 601, 607-09 (Ala. Crim. App.), *cert. denied, Pitchford v. State*, 339 So. 2d 610 (Ala. 1976), *cert. denied, Pitchford v. Alabama*, 430 U.S. 950 (1977). In addition, by statute, Reaves had at the time of Rosser's arrest, the powers and duties of a police officer at the time of the incident made the basis of the plaintiff's complaint. ALA. CODE § 37-2-153(a) (1992) ("A railroad policeman may exercise the same powers of arrest and the right to bear firearms that may be exercised by any state, municipal or other police officer in this state, but only with respect to offenses committed against property owned or in the possession of the railroad by which he is employed or for any offense committed on such property."). Among his powers, a railway policeman may remove a trespasser from railroad property, if the removal is undertaken with only such force as is "reasonably necessary under the circumstances." *Ashworth v. Alabama Great Southern Railroad Co.*, 99 So. 191, 195 (Ala. 1924).

It is uncontested that Reaves is a properly commissioned railway policeman and that he was acting within the line and scope of his duties at the time of the alleged incident. As such, he is afforded discretionary function immunity, absolving him of tort liability arising from his conduct in the performance of any discretionary function within the line and scope of his duties. ALA. CODE § 6-5-338 (Supp. 1997); *Sheth v. Webster*, 145 F.3d at 1236.

---

*v. Espinosa-Guerra*, 805 F.2d 1502, 1506 (11th Cir. 1986). "A law enforcement officer has probable cause to arrest a suspect if the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Von Stein v. Brescher*, 904 F.2d 572, 578 (11th Cir. 1990). Critical to probable cause is some information identifying the subject of the arrest as the perpetrator of the suspected criminal conduct. *See, e.g., Wong Sun v. United States*, 371 U.S. 471, 480-482 [] (1963).

Because the plaintiff was arguably engaging in, and finally convicted of a charge of, criminal trespass, the arrest of the plaintiff by defendant officers was proper, even if it was an unfortunate treatment of a member of the City's homeless population.

Because Reaves was performing a discretionary function at the time of the incident — arresting the plaintiff, the burden shifts to the plaintiff to prove that Reaves acted in bad faith, or with malice or willfulness to overcome the immunity. *Id*. at 1238-39. Reaves did not touch Rosser until after he began to struggle with the police officers and seemed in danger of overpowering them. In addition, Reaves only reacted with minimal force in assisting the officers in subduing Rosser. There exists no arguable inference that Reaves acted in bad faith, or with malice or willfulness.

IV. CLAIMS AGAINST NORFOLK SOUTHERN RAILWAY COMPANY.

The plaintiff apparently alleges that Norfolk Southern Railway Company (along with Reaves) exercised illegal ownership over the property in question and that Norfolk Southern conspired with City of Birmingham police officers to exercise illegal ownership over the property in question. On the claim that Norfolk Southern Railway Company exercised illegal ownership over the rail car in which the plaintiff was found, Rosser is not entitled to bring this action because he neither owns the property in question nor has any legal right to use it. *See Stewart v. White*, 30 So. 526, 527-28 (Ala. 1901) (concluding that, to entitle plaintiffs to relief, it must appear that they have some arguable property right in the property sought to be protected); *McCoy v. Walker*, 410 So. 2d 70, 71 (Ala. Civ. App. 1982) (holding that the plaintiffs' recovery must be founded on legal right to use property); *see also Eagerton v. Williams*, 433 So. 2d 436 (Ala. 1983) (stating that the plaintiff must have an interest in the right to be protected); *Bagley v. City of Mobile*, 352 So. 2d 1115, 1118 (Ala. 1977) (same). Because Rosser is not entitled to bring this claim, summary judgment will be GRANTED on the plaintiff's claims that Norfolk Southern Railway Company exercised illegal ownership over the property in question.

Rosser contends that Joe Durham, who was dismissed as a party to this action, and Norfolk Southern Railway Comapny conspired to violate his federal rights. Rosser identifies 42 U.S.C. § 1985 and 42 U.S.C. § 1983 as the federal statutes under which he is suing. However, the plaintiff has failed to identify the substantive federal rights under which he brings his action. For such reason, all of plaintiff's claims brought pursuant to these statutes will be DISMISSED.

Conclusion

For the foregoing reasons, the defendants motions for summary judgment will be GRANTED; claims against all defendants on whom service of the complaint has not been made will be DISMISSED, without prejudice. As to all other defendants, the claims against them are to be DISMISSED, with prejudice.

DONE and ORDERED this 20th day of January, 1999.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE